UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHARYN SOLOMON          :
:
    Plaintiff,          :
:
    vs.              :    C. A. No. 08-CV-
:
SCHOOL DISTRICT OF
PHILADELPHIA          :
:
                :    JURY TRIAL DEMANDED
:
:
    Defendant        :

COMPLAINT

I.    PRELIMINARY STATEMENT

1.    Sharyn Solomon (hereafter "plaintiff "), has had a long and illustrious career as a special education teacher for the School District of Philadelphia ("the District").  She brings this action pursuant to the Americans with Disabilities Act (ADA), 42 U.S.C. §12101, *et seq.,* Sections 504 and 505 of the Rehabilitation Act, 29 U.S.C. §793 *et seq.,* (hereafter "Section 504"), the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §955(a) to compensate her for injuries she sustained when the District discriminated against her by refusing to provide her with accommodations for her disability. The District thereafter retaliated against Ms. Solomon for the assertion of her right to receive such accommodations and her participation in proceedings before the EEOC. As a result of the District's failure to provide Ms. Solomon with accommodations, she was forced to take sick leave beginning on November 13, 2007. Ultimately, she was forced to retire from the position she has held for many years as a special education teacher for the District, thereby ending the career she loved, and depriving

Philadelphia's students and families the benefit of Ms. Solomon's expertise and commitment to children with special needs.   Due to the District's illegal actions, Plaintiff has suffered financial losses and emotional distress.  She seeks back wages, front pay, pension benefits, and other emoluments of employment which she lost as a result of Defendant's protracted, intentional and illegal employment actions,  as well as compensatory damages.

## II.    JURISDICTION AND VENUE

2.    The Court has jurisdiction over this action pursuant to the Americans with Disabilities Act, 42 U.S.C. §12101, (hereafter "ADA") and the Rehabilitation Act, 29 U.S.C. §793 *et seq.* (hereafter "Section 504").  Jurisdiction is further predicated upon 28 U.S.C. §1331, this being an action arising under the laws of the United States, and 28 U.S.C. §1343. Jurisdiction over the PHRA claim is predicated upon 43 P.S. §962 (c) and this Court's supplemental jurisdiction.

3.    All of the actions complained of herein took place within the Eastern District of Pennsylvania, and Defendant District resides therein.

## III.    PARTIES

4.    Plaintiff is a citizen of the United States who resides in Philadelphia, Pennsylvania.

5.    Ms. Solomon is a qualified individual with a disability as defined by the ADA and Section 504.  Likewise, she is an employee and a person with "non-job-related handicaps" as defined by the PHRA.

6.      The District is a municipal corporation and/or governmental entity and an employer as defined by the ADA, Section 504, and the PHRA.  The District's principal place of business is located at 444 North Broad Street, Philadelphia, PA.  The District is a recipient of federal funds for purposes of Section 504.

## IV.   ADMINISTRATIVE EXHAUSTION

7.      On August 28, 2008 Ms. Solomon filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").  She alleged that beginning in November, 2007, the District had discriminated against her on the basis of her disability i.e., her actual disability as well as her record of impairment and/or because the District regarded her as having a disability as defined by the ADA.

8.      Ms. Solomon's claims pursuant to the Rehabilitation Act, which are continuing, do not require exhaustion.

9.      Although Ms. Solomon's Charge of Discrimination does not specifically allege retaliation, her claims on that basis have been fully exhausted because they are reasonably related to her discrimination claims and would have been uncovered through a reasonable investigation by the EEOC.

10.     Ms. Solomon's Charge of Discrimination was dual filed with the Pennsylvania Human Relations Commission ("PHRC").

11.     The EEOC issued a Dismissal and Notice of Rights in connection with this Charge on April 8, 2010.

V.      **FACTUAL ALLEGATIONS**

12.     Ms. Solomon was hired by the District in approximately 1973 as a special education teacher.

13.     Throughout her long career, Ms. Solomon was a dedicated teacher and performed her job in an exemplary manner.

14.     Ms. Solomon obtained numerous additional credentials throughout the course of her career and became well-respected as a reading specialist for children with special needs. Among other things, Ms. Solomon has a Master's degree in education, a Principal certification in Elementary and Secondary Education, state certificates in both Special and Regular Education, as well as a Supervisor Certificate in Special Education.

15.     Ms. Solomon is a talented reading specialist, holding certifications in some of the most sophisticated and state of the art reading programs available for children with reading disabilities.

16.     Ms. Solomon is one of the very few teachers in the District who holds certifications in Levels 1 and 2 of the Wilson Reading Program, all three "strands" of Project Read, and the Linda Mood-Bell reading method.

17.     In 2007, due to her accomplishments as a teacher and her commitment to excellence, theDistrict chose Ms. Solomon as one of just twenty teachers and administrators to participate in its Leadership Academy, a nine-month program designed to prepare the District's most talented personnel for leadership positions using the most modern and effective leadership techniques.

18.     For many years the District assigned Ms. Solomon to serve as its Special

Education Liaison in the Northeast Region.  As such, she  assumed numerous responsibilities on

the District's behalf including, *inter alia,* coordinating and troubleshooting special education

services among parents, teachers, and administrators, assisting both regular and special

education teachers to ensure the provision of legally adequate special education services to

students with disabilities in both regular and special education classrooms, developing functional

behavior assessments, implementing and monitoring behavior plans for students with behavioral

needs, heading evaluation and programming teams for  students with disabilities, and

troubleshooting programmatic issues as they arose in the District's special education programs.

19.     Throughout the time period relevant to this Complaint, Ms. Solomon was

assigned to the Joseph Greenberg Elementary School (hereafter "the Greenberg School") as a

Resource Room teacher.

20.     Ms. Solomon began working at the Greenberg School in 1980.  In addition to her

teaching duties, she designed the school's resource and inclusion programs for special education

students.

21.     In her daily capacity as a Resource teacher, Ms. Solomon worked with

approximately twenty special education students varying in age from Kindergarten through 5th

Grade.  These children presented disparate needs and received individualized resource support

from Ms. Solomon according to the dictates of their Individualized Education Programs (IEP's).

Accordingly, on a daily basis she required a wide array of materials and supplies, many of which

she had accumulated over the years at her own expense and maintained in her classroom.

22.     Over the years Ms. Solomon developed musculo-skeletal and neurological problems, including disc protrusion and neural foraminal stenosis which, by October, 2007, had created intense, radiating pain in her back and left leg.  This had significantly restricted Ms. Solomon's mobility and her ability to carry out other major life activities, including, *inter alia,* prolonged sitting, standing, carrying, lifting, sleeping, and working.  Climbing steps, in particular, had become extremely difficult for Ms. Solomon. She was also suffering from anxiety and depression.

23.     Around this time Ms. Solomon's doctor advised her that in order to prevent further debilitation, she should attempt to secure accommodations at work which would prevent her from navigating stairs as much as possible.  She was also advised to avoid bending, lifting or carrying anything weighing over five pounds.  Likewise, Ms. Solomon was advised to minimize stress and anxiety as much as possible, as they would increase her debilitation.

24.     In September, 2007, Ms. Solomon returned to work in spite of her restrictions and did the best she could within the confines set forth by her doctor.  She had every intention of doing so for the duration of the school year and for the next 4-5 years, after which she panned to retire.

25.     In early October, 2007, the Principal at the Greenberg School, Gina Hubbard, learned that the District had decided to place a new Autistic Support classroom in her school.

26.     Initially Ms. Hubbard asked a Science teacher and one of the special education teachers on her staff, both of whom were housed on the 2nd Floor near Ms. Solomon's room,  if they would move their classroom in order to make room for the new Autistic Support (AS) class.

27.     The Science teacher, who had far less seniority than Ms. Solomon, and who occupied two classrooms, declined to move.  Without repercussion, she remained in her current location until at least the conclusion of the 2007-8 school year.

28.     The special education teacher, who had far less seniority than Ms. Solomon, declined to move her classroom, and, without repercussion, remained in her current location until at least the conclusion of the 2007-8 school year.

29.     This special education teacher taught in a self-contained program to which only 8-10  students were assigned.

30.     On October 9, 2007 Principal Hubbard demanded that Ms. Solomon move from the 2nd Floor, where she had been stationed for many years, to the 3rd Floor teachers' lounge.

31.     Ms. Hubbard did not request that the 1st Grade classroom teacher stationed in the same hallway with the Science teacher, the special education teacher, and Ms. Solomon, move her classroom.

32.     Likewise, the teacher of the English as a Second Language teacher, also located on the 2nd Floor, was not asked to move.

33.     Mrs. Hubbard did not ask any of the other teachers in the building to move their classrooms to accommodate the new AS class.

34.     The 3rd Floor teachers' lounge was not a classroom at all.  In addition to being much smaller than a classroom, it was then occupied by PA Mentors, an agency which provides contract mental health services to District students who need them at the Greenberg School.

35.     Ms. Solomon met with Ms. Hubbard and advised her that she had been having serious problems with her back which were interfering with her functioning, and that she was going to need some simple accommodations in order to perform her duties on an on-going basis. In addition, she advised Ms. Hubbard that moving to the 3rd Floor would seriously impact her physical health as well as her productivity as a teacher.  In addition to the difficulty with the stairs, Ms. Solomon told Ms. Hubbard that the teachers' lounge was not a full-sized classroom and would not accommodate the supplies and materials which were necessary for Ms. Solomon to perform her job.

36.     Ms. Solomon told Ms. Hubbard that she was already suffering from the stress of completing her work duties due to the pain she was experiencing as a result of her medical condition.  Indeed, she had already missed several days of school.  Ms. Hubbard told Mrs. Solomon that she would "add to [her] stress."

37.     Ms. Solomon advised Ms. Hubbard that other space in the school could be used for the AS classroom.

38.     Ms. Hubbard agreed to investigate alternative options for the AS classroom and promised to get back to Ms. Solomon in November.

39.     There was no practical or pedagogical reason why the AS classroom had to be located on the 2nd Floor or could not be adequately housed in any one of the empty spaces already available in the building. Indeed, there was an empty classroom right next door to her room.

40.     Ms. Hubbard falsely asserted to other teachers that Ms. Solomon had refused to move her classroom, causing tensions between Ms. Solomon and other staff members, some of whom began regularly appearing in her classroom to interrogate her as to why she would not move.

41.     On October 19, 2007, without further communication with Ms. Solomon, Ms. Hubbard sent a letter to Ms. Solomon directing her to move to the 3rd Floor teachers' lounge by no later than October 31st.

42.     Ms. Solomon provided Ms. Hubbard with a letter from her treating physician, Dr. John Telegadis, briefly describing her condition and indicating that Ms. Solomon needed to avoid lifting and bending.  He further advised that stress and anxiety would exacerbate her condition.

43.     Ms. Solomon again requested that Ms. Hubbard seek another alternative for the AS classroom.

44.     Once again, Ms. Hubbard told Ms. Solomon that she would get back to her in November.

45.     In addition to the classroom right next door to Ms. Solomon's own room, there were three other classrooms in the building which were either unoccupied or which could be moved without interrupting the staff and students at Greenberg.  For instance, Home-School Association ("HAS") occupied a very large space on the 1st Floor which it used infrequently. Indeed, the basement space where the HAS used to be housed was still vacant.

46.     Ms. Solomon missed a few days of work because of pain produced or exacerbated by the stress and anxiety of the workplace.  She returned to work with notes from Dr. Telegadis dated October 23rd and 25th documenting that she was suffering from low back pain, sciatica and anxiety.

47.     On November 2, 2007 Ms. Solomon met again with Ms. Hubbard.  She again advised Ms. Hubbard that the teachers' lounge would not accommodate her supplies and its location on the third floor would constitute a physical hardship for her.

48.     Although she knew that Ms. Solomon needed to avoid stair climbing as much as possible, Ms. Hubbard suggested that Ms. Solomon leave her supplies in her current classroom and walk up and down the stairs between classes to retrieve what she needed for each class period.

49.     Ms. Hubbard claimed not to know about the notes from Dr. Telegadis.  When Ms. Solomon provided her with additional copies, Ms. Hubbard began screaming at her.

50.     Ms. Solomon wrote to Ms. Hubbard again on November 3rd and 4th.  She complained that Ms. Hubbard had refused to accommodate her and ignored letters from her doctor.  Moreover, Ms. Hubbard had been uncivil and unprofessional in her response to her requests for accommodation, which were more than reasonable in light of the readily available alternatives for housing the AS classroom.

51.     Meanwhile, recognizing that she might have to go forward with the move, Ms. Solomon requested that custodial assistance be provided to facilitate the move, as Ms. Hubbard had done nothing to arrange for such assistance.

52.     Ms. Hubbard wrote to Ms. Solomon on November 7, 2007 demanding that she move her classroom, accusing her of insubordination, and threatening her with dismissal, suspension, and unsatisfactory rating if she failed to comply.  Moreover, Ms. Hubbard told Ms. Solomon that she would be required to schedule the move on her own time so that services to her students would not be interrupted.

53.     The stress of the situation at work exacerbated the pain Ms. Solomon was experiencing to an unbearable level.  Beginning on November 13, 2007, Ms. Solomon took sick leave to address her physical and mental deterioration.  However, she actively pursued her request for accommodation so that she could return to work as soon as possible.

54.     On November 11, 2007 Ms. Solomon again notified Ms. Hubbard that there were 4 empty classrooms available in the school which could easily accommodate the AS classroom. This was particularly so as it had come to light that the AS teacher initially would have no students at all, and then would have just one student.

55.     Ms. Solomon notified Ms. Hubbard that PA Mentors, currently stationed in the 3rd Floor teachers' lounge, did not want to be moved to a full-sized classroom because it was too big for its needs and there would be no telephone, something which the PA mentors needed very much.

56.     Ms. Hubbard ignored Ms. Solomon's requests and moved PA Mentors to a full-sized classroom, one which would have easily accommodated the new AS classroom.

57.     On December 31, 2007, Ms. Solomon provided the District with a letter from Dr. Telegadis indicating that she was diagnosed with lumbar disc protrusion and neural foraminal stenosis.  He noted that Ms. Solomon wished to return to work as soon as possible.  In

order to do so, she needed a classroom placement on the 1st Floor.  Additionally, she would not be able to perform duties requiring lifting and carrying.  She would not be able to navigate stairs.

58.    Provided the accommodations he set forth in his correspondence were arranged, Dr. Telegadis indicated that Ms. Solomon could return to work on January 28, 2008.

59.    Ms. Hubbard called Ms. Solomon at home on January 17, 2008.  She asked Ms. Solomon how the District could help her return to work.  Ms. Solomon promised to provide Ms. Hubbard with yet another letter from her doctor outlining her request for accommodation.

60.    In a letter dated January 22, 2008, Ms. Solomon provided Ms. Hubbard with another letter from Dr. Telegadis which advised that she could return to work if she could be provided with a 1st Floor classroom.  Ms. Solomon requested a response by Ms. Hubbard by January 29, 2008.

61.    Although Dr. Telegadis noted that Ms. Solomon would be seeing a neurosurgeon on February 13, 2008, he did not indicate that she could not return to work in the meantime so long as that she received the accommodations he had requested on her behalf.

62.    When no answer from Ms. Hubbard was forthcoming by January 29th, Ms. Solomon forwarded her a letter from Dr. Telegadis dated January 30th reiterating the accommodation request.  He indicated that he could only recommend Mrs. Solomon's return to work if she were provided with accommodations on the 1st Floor of the building in order to minimize stair climbing.

63.    First floor space at Greenberg could have been made available by moving the Home-School Association back to the basement or to one of the other vacant rooms in the building.

64.     On February 6, 2008, Dr. Telegadis provided Ms. Solomon with another letter requesting accommodations, including a 1st Floor classroom assignment.  In light of the fact that such accommodations had not been provided and apparently were not forthcoming, he said that Ms. Solomon could not return to work at that time.

65.     At no time did Ms. Solomon withdraw her accommodation request nor did any of her doctors advise the District that if properly accommodated, she could not or would not return to work.

66.     Ms. Solomon regularly reported to the District's Employee Health Services (EHS) for examinations and evaluations regarding her work status and provided her doctors' notes and accommodation requests to Dr. Aribelle Jones, the District's EHS physician.  Dr. Jones stated time and again that she did not know anything about the situation.  Never did she provide Ms. Solomon with an authorization to return to work with accommodations.

67.     On April 14, 2008, having run out of sick time, Ms. Solomon was forced to apply for short-term disability benefits, resulting in a 25% reduction in her income.

68.     Because accommodations still had not been provided, Ms. Solomon secured a note from Dr. Telegadis indicating that she could not return to work  for the rest of the year.

69.     On August 28, 2008, Ms. Solomon filed a Charge of Discrimination with the EEOC.

70.     Shortly therafter, Ms. Solomon learned that Mrs. Hubbard had been disparaging her to her colleagues, accusing her of pretending to be sick because she did not want to move, falsely alleging that Ms. Solomon was at home caring for her mother (who had been dead for

over 10 years), and other false and defamatory statements designed to injure Ms. Solomon's reputation as well as the support and respect she had heretofore enjoyed from her colleagues.

71.    Through counsel, Ms. Solomon demanded that Ms. Hubbard stop making disparaging remarks about her.

72.    Ms. Solomon continued to provide documentation to the District indicating that if she were properly accommodated, she could return to work.  In December, 2008, Ms. Solomon provided medical documentation supporting her accommodation request from a neurologist, Dr. Leonard Bruno.

73.    In April, 2009, having run out of sick leave, Ms. Solomon was forced to take a health sabbatical in order to cover her absences and maintain some income in light of her inability to return to her job.  Accordingly, her income was reduced by 50%.

74.    Her application for short-term disability triggered an appointment with Dr. Jones at EHS.  Ms. Solomon and her adult son advised Dr. Jones that in lieu of the health sabbatical, Ms. Solomon could return to work if Dr. Jones would provide her with an authorization to return to work.

75.    The EHS doctor said she did not know anything about accommodations for Ms. Solomon.  Because she could not return to work without restrictions, the EHS doctor denied Ms. Solomon's request to return to work at all.  She approved the application for disability benefits, however.

76.    Even while she was on sabbatical, Ms. Solomon provided regular medical information to the District expressing her desire to return to work and specified the accommodations she needed in order to do so.

77.     Ms. Solomon was so desperate to secure an accommodation that she enlisted the help of Senator Bob Casey hoping to speed the processing of her EEOC complaint so that she could return to work.

78.     In approximately June, 2009, during another return to work physical at EHS, Ms. Solomon and her son advocated for a return to work note recommending accommodations. Again, the EHS doctor said she could not help them.  Instead, she stated that Ms. Solomon could return to work *without* accommodations.

79.     Ms. Solomon's neurologist and treating doctor told the District that without accommodation, Ms. Solomon would be temporarily totally disabled until approximately September, 2009.

80.     On this basis, EHS withdrew its return to work note altogether.  However, because Ms. Solomon could not return to work without restrictions, the EHS doctor recommended that she not be allowed to return to work at all.

81.     Through the 2009-10 school, year, the District continued to refuse Ms. Solomon's requests for accommodation and the medical documentation she provided in connection with those requests.

82      In approximately March, 2010, having run out of options for preserving her employment and her income, Ms. Solomon had no choice but to retire from her position.

83.     Throughout the relevant time period, the District could have provided Ms. Solomon with a 1st Floor accommodation without significant difficulty or expense.

84.     Additionally, because of Ms. Solomon's credentials, she was highly qualified to perform a wide range of teaching and administrative jobs throughout the District.

85.     The District ignored Ms. Solomon's and her doctors' accommodation requests. Additionally, although it was required to do so, it failed to engage in an interactive process which easily could have resulted in an accommodation for Ms. Solomon either in her current position at Greenberg Elementary or in another position within the District.

86.     The District's decision to deprive Ms. Solomon of the ability to work with accommodations was intentional and done with knowledge of her rights pursuant to the ADA, Section 504, and the PHRA.  These actions were in reckless and intentional disregard and deliberate indifference to those rights.

87.     Additionally, the District's actions were retaliatory and taken for the express purpose of penalizing Ms. Solomon for her assertion of her right to receive accommodations for her disability.

88.     The District forced Ms. Solomon into retirement entirely against her will by its failure to initiate an interactive process and its demand that she return to work either without restrictions or not at all, even after she made her disability known and asked for accommodations.

89.     Having made repeated requests for accommodation which were denied or ignored over the course of almost three years, and requiring accommodations in order to return to work, Ms. Solomon's retirement was the only reasonable option left open to her.  Her retirement was intended by the District and entirely foreseeable.

90.     As a result of the Defendants' intentional conduct against Ms. Solomon, she has suffered financial losses, emotional distress, and other compensatory damages and emoluments of employment to which she would have been entitled had she been allowed to

work with accommodations from November 13, 2007 through the present time. Additionally, due to her forced retirement, Ms. Solomon's losses will continue indefinitely due to the long-term impact of her reduced retirement benefits and the other emoluments, she has forfeited by virtue of her retirement.

**VI.**     **STATEMENT OF CLAIMS**

        **COUNT I: FAILURE TO ACCOMMODATE PURSUANT TO THE ADA AND SECTION 504**

91.     The allegations set forth in Paragraphs 1-90 are reasserted and incorporated by reference herein.

92.     Sharyn Solomon is an employee and a qualified person with a disability pursuant to the ADA and Section 504 because she has physical and neurological impairments that substantially limit one or more of her major life activities, including, but not limited to, lifting, standing, sleeping, and working.

93.     Ms. Solomon was qualified to continue her job as a special education teacher and was also qualified for a wide range of other jobs within the District given her educational background and long experience in her field, either with or without accommodation.

94.     Ms. Solomon properly requested accommodations beginning in November, 2007 and continued to request them through April, 2010 when she was forced to retire.

95     Throughout the relevant time period, November, 2007 through March, 2010, the District knew that Ms. Solomon had requested assistance and accommodations due to her disability.

96.     The District could have provided such accommodations to Ms. Solomon without significant difficulty or expense.

97.     The District failed to engage in the interactive process in order to determine in good faith whether Ms. Solomon could perform her position with accommodations.

98.     The District's failure to engage in the interactive process and to accommodate Ms. Solomon in her position at Greenberg Elementary and/or to transfer her to a vacant position commensurate with her education, training, and experience, constitutes discrimination pursuant to the ADA and Section 504 solely because of Ms. Solomon's disability.

### COUNT II: FAILURE TO ACCOMMODATE UNDER THE PENNSYLVANIA HUMAN RELATIONS ACT

99.     The allegations set forth in Paragraphs 1-98 are reasserted and incorporated by reference herein.

100.    The District's failure to engage in the interactive process and to accommodate Ms. Solomon in her position at Greenberg Elementary and/or to transfer her to a vacant position commensurate with her education, training, and experience, constitutes discrimination pursuant to PHRA because of Ms. Solomon's non-job related handicap or disability, the District's perception of that non-job related disability, and/or because of Ms. Solomon's record of impairment, 43 P.S. §955 (d).

**COUNT III:  INTENTIONAL DISCRIMINATION IN VIOLATION
OF  THE AMERICANS WITH DISABILITIES ACT AND SECTION 504**

101.    The allegations set forth in Paragraphs 1-100 are reasserted and incorporated by reference herein.

102.    The District intentionally discriminated against Plaintiff solely on the basis of her disability, her record of impairment, and/or because it erroneously perceived the nature and extent of her disability by, *inter alia,* 1) preventing Ms. Solomon from returning to work at all unless she could do so without accommodations, thereby constructively discharging her from her employment on April 16, 2010; 2) requiring Ms. Solomon, a Senior Career Teacher, to move from a full-sized classroom to a 3rd Floor teachers' lounge, knowing it would exacerbate her physical condition and/or prevent her from fulfilling her job duties; 3) refusing to provide Ms. Solomon with accommodations since November 13, 2007, knowing that those accommodations were necessary in order for her to return to work; 4) failing and/or refusing to engage in good faith in the interactive process; 5) attacking Ms. Solomon's reputation and character to explain her failure to return to work.

103.    Defendant's intentional discrimination against Ms. Solomon on the basis of her disability violated her rights under the Americans with Disabilities Act and Section 504.

**COUNT IV : INTENTIONAL DISCRIMINATION AGAINST
PLAINTIFF IN VIOLATION OF THE PHRA**

104.    The allegations set forth in Paragraphs 1-103   are reasserted and incorporated by reference herein.

105.     Defendant's intentional discrimination against Ms. Solomon on the basis of her

disability as set forth in Count IV violated her rights under the PHRA, 43 P.S. § 955(a).

### COUNT V: RETALIATION AGAINST PLAINTIFF PURSUANT TO THE AMERICANS WITH DISABILITIES ACT

106.     The allegations set forth in Paragraphs 1-105 are reasserted and incorporated by

reference herein.

107.     Plaintiff engaged in protected activity pursuant to the ADA, Section 504, and the

PHRA by asserting rights guaranteed by the Act, including her right to accommodation and her

right to be treated in a non-discriminatory manner in spite of her disability, record of

impairment, and/or the District's perception thereof, and by filing a complaint of documentation.

108.     The District failed to meaningfully and timely provide Plaintiff with a reasonable

accommodation, and failed to take effective and remedial action as a result of her legitimate

complaints that it failed to do so.  Likewise, as set forth in this Complaint, it treated her

adversely as a result of her requests for accommodation and her EEOC charge, by *inter alia,* 1)

preventing Ms. Solomon from returning to work at all unless she could do so without

accommodations, thereby constructively discharging her from her employment on April 16,

2010; 2) requiring Ms. Solomon, a Senior Career Teacher, to move from a full-sized classroom

to a 3rd Floor teachers' lounge, knowing it would exacerbate her physical condition and/or

prevent her from fulfilling her job duties; 3) refusing to provide Ms. Solomon with

accommodations since November 13, 2007, knowing that those accommodations were necessary

in order for her to return to work; 4) failing and/or refusing to engage in good faith in the

interactive process; 5) attacking Ms. Solomon's reputation and character to explain her failure to

return to work and to penalize her for opposing the District's illegal conduct and for participating in proceedings before the EEOC to redress the District's discriminatory conduct.

109.    The District's response to Ms. Solomon's requests for accommodation and other protected conduct would have been materially adverse to a reasonable worker and could well have dissuaded a reasonable worker from making or supporting a request for accommodation or otherwise advocating for their rights under the ADA and/or Section 504.

110.    Defendant's actions were causally connected to Ms. Solomon's protected activity, and constitutes illegal retaliation in violation of Plaintiff's rights pursuant to Section V of the ADA and Section 504.

### COUNT VI: RETALIATION AGAINST PLAINTIFF PURSUANT TO THE PENNSYLVANIA HUMAN RELATIONS ACT

111.    The allegations set forth in Paragraphs 1-110 are reasserted and incorporated by reference herein.

112.    Defendant's conduct as set forth in Count V constitutes illegal retaliation in violation of Plaintiff's rights pursuant to the PHRA, 43 P.S. §955 (d).

**WHEREFORE,** Plaintiff seeks the following relief:

113.    A declaratory judgment that the actions of the District constituted discrimination and retaliation against Plaintiff in violation of her rights under the ADA, the Rehabilitation Act, the Pennsylvania Human Relations Act.

114.    Award Plaintiff all the emoluments of employment to which she would have been entitled had it not been for the Defendant's discriminatory and retaliatory conduct as set forth herein, from November 13, 2007 through the date Plaintiff expected to retire;

115.    Award the Plaintiff compensatory damages for the losses she sustained and the emotional distress she suffered as a result of Defendant's discriminatory employment treatment;

116.    Award Plaintiff and her counsel all costs and attorneys fees which they have incurred and will incur in the prosecution of this action.


Respectfully submitted,


lm9023
LORRIE McKINLEY, ESQUIRE
Attorney I.D. No. 41211
Counsel for Plaintiff Helen Alford

McKINLEY & RYAN, LLC
16 West Market Street, 3rd Floor
Philadelphia, PA 19102
(610) 436-6060
Fax: (610) 436-6804


DATED: July 1, 2010