IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHARYN SOLOMON                    :         CIVIL ACTION
                                  :
       v.                         :
                                  :
SCHOOL DISTRICT OF PHILADELPHIA :    NO. 10-3221

MEMORANDUM

Dalzell, J.                                  March 12, 2012

      Plaintiff Sharyn Solomon ("Solomon") sues defendant

School District of Philadelphia (the "District"), asserting

claims under the Americans with Disabilities Act ("ADA"), 42

U.S.C. § 12101, et seq., § 504 of the Rehabilitation Act ("§

504"), 29 U.S.C. § 794, and the Pennsylvania Human Relations Act

("PHRA"), 43 Pa. Cons. Stat. § 955(a).  Solomon alleges that the

District failed to accommodate her "musculo-skeletal and

neurological problems," Pl.'s Compl. ¶ 22, discriminated against

her based on these problems, and then retaliated against her for

seeking accommodations and filing a complaint with the EEOC.

      The District filed a motion for summary judgment

challenging Solomon's claims that has now been fully briefed.[1]

_____

    [1] Regrettably, the briefing was subpar, with
disorganized and haphazard argument from the District, inaccurate
or missing citations from Solomon, and a general inability to
apply the law to the facts of this case.  We were surprised to
receive such submissions from such veteran counsel.

For the reasons we articulate below, we will grant the District's motion in part.

## I.   <u>Factual Background</u>

Fed. R. Civ. P. 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," and Rule 56(c) elaborates that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  We will thus present the facts as to which the parties agree, pausing occasionally to note areas of factual disagreement.

### A.   <u>Solomon's Career With The District</u>

Solomon began working at the District in the early 1970s, Def.'s Stmt. of Facts ("Def.'s Stmt.") ¶ A-1[2]; Pl.'s Resp.

---

[2] Though the District did not enumerate its statement of undisputed facts, in Solomon's response to this statement she numbered the District's statements serially within each section

(continued...)

to Def.'s Stmt. ("Pl.'s Resp.") ¶ A-1.  According to Solomon, she was transferred to Greenberg Elementary School ("Greenberg") in 1975.  Pl.'s Resp. ¶ A-2 (citing Def.'s Ans. ¶ 20).  The District employed Solomon as a special education teacher.  Def.'s Stmt. ¶ A-3; Pl.'s Resp. ¶ A-3.  Shortly after her transfer to Greenberg, Solomon was assigned to Room 213, located on the second floor of the building.  Def.'s Stmt. ¶ A-4; Pl.'s Resp. ¶ A-4.  During the years that Solomon worked in this classroom -- until 2007 -- she never complained of any disability or identified any restrictions that prevented her from accessing the room.  Def.'s Stmt. ¶ A-10; Pl.'s Resp. ¶ A-10.

**B.     The District's Decision To Relocate Solomon's Class**

In 2005, Gina Hubbard ("Hubbard") became principal of Greenberg.  Def.'s Stmt. ¶ B-1; Pl.'s Resp. ¶ B-1.  In October of 2007, the District notified Hubbard that a new autistic support program would begin operating at Greenberg in November of that year, and that she needed to choose a classroom to house the program.  Def.'s Stmt. ¶¶ B-2 to B-3; Pl.'s Resp. ¶¶ B-2 to B-3.

_____

[2](...continued)
and then responded to each statement.  We adopt Solomon's system of numbering, and will similarly refer to the District's factual contentions by section and sentence number.

Hubbard testified that in initially identifying the classroom she considered guidelines for special education classrooms, the school's layout, the need to keep grades physically close to each other, the age of students in the program, and the need to avoid isolating special needs students from their peers. Def.'s Stmt. ¶ B-4; Pl.'s Resp. ¶ B-4. After considering several rooms and consulting a few teachers, Hubbard chose Room 213 to house the program. Def.'s Stmt. ¶¶ B-5 to B-6; Pl.'s Resp. ¶¶ B-5 to B-6.

According to Hubbard, Room 213 was the most desirable location for the new autistic program because it was large and was located near the kindergarten and first-grade classrooms. Furthermore, relocating Solomon's class would create the least disturbance for the school as a whole, since the class had fewer students than classes in the other rooms Hubbard considered. Def.'s Stmt. ¶ B-7 (citing Ex. C to Def.'s Stmt. ("Hubbard Dep.")[3] at 68-69). Solomon disagrees that Room 213 was the most

---

[3] Solomon suggests that "Hubbard's affidavit . . . is not properly before the Court and should be disregarded," Pl.'s Resp. ¶ A-5, citing to Hill v. City of Scranton, 411 F.3d 118, 131 n.22 (3d Cir. 2005). In Hill, our Court of Appeals noted that "when evaluating a summary judgment motion a court should not consider even uncontradicted testimony of an interested witness where that testimony supports the movant." 411 F.3d at
(continued...)

desirable location for the new program, inasmuch as the program did not require a large class space, Pl.'s Resp. ¶ B-7 (citing Ex. E to Def.'s Stmt. at 42-43).  Solomon also disagrees that placing the program in Room 213 would have created the least disturbance for the school in general since (1) Solomon's class required many materials that would not fit in a smaller room,[4] id. (citing Ex. D to Def.'s Stmt. ("Solomon Dep.") at 80), and (2) at least one parent[5] objected to moving Solomon's class.  Id. (citing Ex. P-9 to Pl.'s Resp.).  The parties agree, however,

---

[3](...continued)
132 n.22.  If Hill applies to bar the Court from considering Hubbard's affidavit, it would appear equally to foreclose consideration of Hubbard's deposition testimony.  However, Solomon has not explained to the Court why Hubbard qualifies as an interested witness under Hill.  Solomon has certainly not suggested that Hubbard has a material interest in the outcome of this litigation.  In any event, Solomon has disputed many of the factual assertions that the District cites based upon Hubbard's affidavit and testimony, and, as we explain below, in ruling on this Rule 56 motion we will accept Solomon's version of the facts insofar as citations to the record support it.

[4] Solomon also claims that she "had numerous students in and out of her room from day to day, period to period, and was frequently engaging in multiple lessons at one time," Pl.'s Resp. ¶ B-7, but the page of deposition testimony to which she points does not support this contention.  See Solomon Dep. at 80.

[5] Solomon asserts that "a number of parents objected" to this move, Pl.'s Resp. ¶ B-7, but the exhibit to which she points only includes what appears to be two emails from a single parent to Hubbard.  Ex. P-9 to Pl.'s Resp.

that autistic support classes are typically placed on the first
or second floor of a school, and that Henry Gross, the Director
of Special Education for the Northeast Region (presumably, in the
District), determined that Room 213 was appropriate for the
program after completion of an inspection.[6]  Def.'s Stmt. ¶¶ B-8
to B-9; Pl.'s Resp. ¶¶ B-8 to B-9.

On October 9, 2007, Hubbard sent a memorandum to
Solomon advising that her classroom had been reassigned from Room
213 to Room 311[7] -- which was located on the third floor of
Greenberg.  Def.'s Stmt. ¶¶ C-1, B-11; Pl.'s Resp. ¶¶ C-1, B-11.
Room 311 was comparable in size to the classrooms of other
resource room teachers, Def.'s Stmt. ¶ B-13; Pl.'s Resp. ¶ B-13.
Hubbard also testified that Room 311 was appropriate for
Solomon's class because she only had a limited number of
students, Def.'s Stmt. ¶ B-15 (citing Hubbard Dep. at 68), though

---

[6] Solomon alleges that "Mr. Gross did not do the
inspection himself," Pl.'s Resp. ¶ B-9, but includes no record
citation supporting this assertion.

[7] The District asserts that placing the autistic class
in Room 213 required moving Solomon's classroom to Room 311,
Def.'s Stmt. ¶ B-10 (citing Hubbard Dep. at 63-67), but Hubbard's
cited deposition testimony does not support this claim.  Solomon
disputes this assertion, stating that there were other classrooms
in which the autistic support class could have been placed, but
points to no record citation in support of her contention.

Solomon denies that she had a smaller number of students.  Pl.'s Resp. ¶ B-15 (citing Solomon Dep. at 238).  Hubbard's memorandum offered the services of the school engineering staff to assist Solomon in moving classrooms.  Def.'s Stmt. ¶ C-2; Pl.'s Resp. ¶ C-2.

By October 18, 2007, Solomon had not begun the process of preparing to transfer classrooms, and that day Hubbard sent her a second memorandum setting a deadline of October 31, 2007 for the completion of the move.  Def.'s Stmt. ¶¶ C-3 to C-4; Pl.'s Resp. ¶¶ C-3 to C-4.  Solomon never complied with Hubbard's requests to move and made no steps toward moving.  Def.'s Stmt. ¶ C-5 (citing Solomon Dep. at 65-66).[8]  Instead, she wrote letters to Hubbard and orally protested the move.  Id. ¶ D-1 (citing Solomon Dep. at 80).  On either October 18 or 19, 2007, Solomon told Hubbard that Room 311 was too small for her class because her supplies would not fit in the new room.  Def.'s Stmt. ¶ D-3;

---

[8] Solomon disputes this statement but offers no citation to the record in support of her preferred factual account.  Pl.'s Resp. ¶ C-5.  As footnotes 4 through 8 make plain, Solomon does not allow the record to constrain her averments.  In presenting the remaining facts in this section, we will not note every instance in which Solomon has failed to support her claims with citations to the record, but instead will simply ignore those claims that are unsupported and treat contrary supported averments by the District as undisputed.

Pl.'s Resp. ¶ D-3.  On October 24, 2007, Solomon wrote an email

to Hubbard explaining that "[i]t would be beneficial to remain in

my present classroom" and that "[i]f I am not able to work in a

classroom of equal size, then it is impossible to bring the

inventory in my current room to a room that cannot and is not

equipped to house my resources.  Therefore, it will affect my

ability to teach."  Ex. I to Def.'s Stmt.  Notably, Solomon did

not state that she would prefer to work on a particular floor,

Def.'s Stmt. ¶ D-5; Pl.'s Resp. ¶ D-5, and her email did not

mention any physical impairments or any need for accommodations.

Def.'s Stmt. at 5 (citing Ex. I to Def.'s Stmt.).  On November 7,

2007, Hubbard sent Solomon a memorandum directing her to complete

her move by that same day, Def.'s Stmt. ¶ F-1 (citing Ex. H to

Def.'s Stmt.), and offering the assistance of the building

engineering team.  Def.'s Stmt. ¶ F-2; Pl.'s Resp. ¶ F-2.  The

memorandum noted that failure to comply would result in

disciplinary action -- including possible suspension -- an

unsatisfactory rating, or termination.  Pl.'s Resp. at 4 (citing

Ex. H to Def.'s Stmt.).

On November 15, 2007, Solomon wrote a letter to Hubbard

in which she summarized their discussions regarding the move and

proposed three alternatives to moving her classroom from Room

213.  Ex. N to Def.'s Stmt.  Solomon recalled that

> I tried to explain to you that, in addition
> to placing my first through third graders on
> a floor with the seventh and eighth-graders,
> room 311 is so much smaller than my present
> room that I would not have the space for my
> computers, file cabinet, desks, work
> stations, activity charts, supplies, and
> other learning aids which are currently set
> up in my present location. . . . I stated
> that I needed all of the supplies in order to
> teach the students.

Id. at 017.  Solomon added that "[i]f any of my above suggestions

are not workable, I will move to the third floor lounge, as you

have requested."  Id. at 018.

As we discuss below, on October 9, 2007, Solomon had

told Hubbard that she was having back problems, and by November

15, 2007 she had supplied the District with three doctor's notes

limiting her activities.  Though Solomon's letter explained that

she needed custodians to help her with any move due to her back

condition, she did not justify her request that her classroom

remain Room 213 with any reference to her physical condition.

Def.'s Stmt. ¶¶ H-3, H-6 to H-7; Pl.'s Resp. ¶¶ H-3, H-6 to H-7.

Hubbard did not respond to Solomon's letter, Pl.'s Resp. at 25

(citing Solomon Dep. at 118-19), and Solomon's class was

eventually moved from Room 213 to Room 311 in January of 2008 -- in her absence.  Def.'s Stmt. ¶ I-11; Pl.'s Resp. ¶ I-11.

### C.   __The Parties' Discussions Regarding Accommodations__

Solomon testified that on October 9, 2007, she told Hubbard that she was having problems with her back.  Pl.'s Resp. at 3 (citing Solomon Dep. at 79).  Ten days later, the day after Hubbard's second memorandum to her, Solomon secured a note from her primary care physician, Dr. John Telegadis ("Dr. Telegadis"), stating that she "'should not do any lifting or bending'" because it "'may aggravate her current injury'".  This was the first doctor's note mentioning that Solomon had any physical limitations and was also Solomon's first request for accommodations from the District.[9]  Def.'s Stmt. ¶¶ E-1 to E-3; Pl.'s Resp. ¶¶ E-1 to E-3.  The note specified that Solomon was "under my care for low back pain, sciatica and anxiety."  Ex. J to Def.'s Stmt.  On October 23, 2007, Dr. Telegadis issued a note reiterating that Solomon should not engage in any lifting or bending, and two days later she produced a third note repeating these restrictions and adding a carrying limitation.  Def.'s

---

[9] Though the District claims that it has no record of receiving this note, it admits receipt thereof for purposes of its motion for summary judgment.  Def.'s Stmt. at 5 n.2.

Stmt. ¶¶ E-4 to E-5; Pl.'s Resp. ¶¶ E-4 to E-5.  Importantly, Dr. Telegadis's notes did not propose any specific accommodation for Solomon's physical limitations.[10]  Def.'s Stmt. ¶ E-9 (citing Exs. J-L to Def.'s Stmt.).

Solomon testified that her lifting and carrying limitations left her unable to lift or carry items weighing more than five pounds, and that her bending limitation rendered her unable to bend in the course of daily activities.  She admitted that her job as a teacher required her to bend and lift more than five pounds since the books and materials she used in teaching weighed more than this limit.  Def.'s Stmt. ¶¶ E-6 to E-8; Pl.'s Resp. ¶¶ E-6 to E-8.  Solomon stresses that lifting and bending were not essential functions of her job.  Pl.'s Resp. ¶¶ E-8 (citing Ex. P-3 to Pl.'s Resp.).

According to Solomon, on November 2, 2007, she met with Hubbard to discuss the proposed move and her medical condition.

---

[10] The District asserts that Solomon herself did not "propose[] to the School District any specific accommodation for the stated physical limitations," Def.'s Stmt. ¶ E-9 (citing Solomon Dep. at 36, 97), but the deposition testimony that it cites supports only the proposition that Solomon never requested an assistant to help her get needed supplies.  Solomon Dep. at 36, 97.  The parties agree that Solomon never requested such an assistant.  Def.'s Stmt. ¶ E-11; Pl.'s Resp. ¶¶ E-11.  We note that Solomon incorrectly enumerated paragraphs E-9 through E-11 of the District's statement of facts as E-7 through E-9.

This meeting did not go well.  Hubbard allegedly screamed at Solomon when she attempted to provide Hubbard with copies of Dr. Telegadis's notes, and refused to provide Solomon with any accommodation for her back problems.[11]  Pl.'s Resp. ¶ F-1 (citing Exs. P-5, P-6 and P-7 to Pl.'s Resp.).  Solomon then took sick leave beginning on November 13, 2007.  Def.'s Stmt. ¶ G-1; Pl.'s Resp. ¶ G-1.  As of that date, she had only provided the District with notice that she should not engage in lifting, bending, or carrying, and had neither advised of any restriction involving climbing stairs nor requested a first-floor classroom.  Def.'s Stmt. ¶¶ G-2 to G-3; Pl.'s Resp. ¶¶ G-2 to G-3.

On December 31, 2007, Dr. Telegadis issued a note stating that Solomon had been diagnosed with a lumbar disc protrusion[12] and neural foraminal stenosis,[13] Ex. P to Def.'s

---

[11] Solomon claims that "when Ms. Solomon attempted to address her legitimate space issues, Ms. Hubbard . . . told her to just leave her materials in her room and run back and forth to get them between periods."  Pl.'s Resp. ¶ F-1 (citing Exs. P-5, P-6 and P-7 to Pl.'s Resp.).  Unsurprisingly, the cited portions of the record do not support this claim.

[12] We may define this term by its components.  Lumbar: "of, relating to, or constituting the loins or the vertebrae between the thoracic vertebrae and sacrum."  Intervertebral disk: "any of the tough elastic disks that are interposed between the centra of adjoining vertebrae and that consist of an outer annulus fibrosus enclosing an inner nucleus pulposus."  Medline
(continued...)

Stmt., and thus "'has to be placed on the first floor.'"  Def.'s

Stmt. ¶ I-1; Pl.'s Resp. ¶ I-1.  Dr. Telegadis suggested that if

Solomon's condition improved and the recommended room change

occurred, she could return to work by January 28, 2008.  Def.'s

Stmt. ¶ I-1; Pl.'s Resp. ¶ I-1.  In his testimony, Dr. Telegadis

explained that to avoid exacerbating her pain Solomon should not

climb more than one flight of stairs, consisting of seven or

eight steps, per day.[14]  Def.'s Stmt. ¶ I-7; Pl.'s Resp. ¶ I-7.

　　　　In January of 2008, Hubbard called Solomon on the

telephone and asked what the District could do to help her

physical condition.  Def.'s Stmt. ¶ K-1 (citing Ex. Q to Def.'s

---

　　　　[12](...continued)
Plus Medical Dictionary, U.S. Dep't of Health & Human Servs.
("HHS"), http://www.nlm.nih.gov/medlineplus/mplusdictionary.html.

　　　　[13] Neural: "situated in the region of or on the same
side of the body as the brain and spinal cord."  Foramen: "a
small opening, perforation, or orifice."  Spinal stenosis:
"narrowing of the lumbar spinal column that produces pressure on
the nerve roots resulting in sciatica and a condition resembling
intermittent claudication and that usually occurs in middle or
old age."  Medline Plus Medical Dictionary, HHS,
http://www.nlm.nih.gov/medlineplus/mplusdictionary.html.

　　　　[14] Solomon testified that she is able to climb stairs
but that it simply takes her longer to do so.  Furthermore, the
parties agree that Solomon's three-story home -- which is not
equipped with an elevator -- has an eight-step entrance, and that
its bathroom and bedroom are located on the second floor.  Def.'s
Stmt. ¶¶ I-5, I-8 to I-9; Pl.'s Resp. ¶¶ I-5, I-8 to I-9.

Stmt.; Solomon Dep. at 17-19).  According to Solomon, she
explained that she would have her doctor write the District
another letter about her needed accommodations.  Solomon Dep. at
19-20.  On January 22, 2008, Solomon forwarded Hubbard a letter
from Dr. Telegadis explaining that she was still under his care
for a lumbar disc protrusion and neural foraminal stenosis, and
that "[d]ue to her condition [he] strongly recommend[ed] that she
be placed on the first floor of the school building prior to her
returning to work."  Ex. Q to Def.'s Stmt.  Solomon requested
that Hubbard respond to the letter by January 29, 2008, id., but,
according to Solomon's testimony, Hubbard "just ignored it."
Solomon Dep. at 20.  Solomon initiated no further contact with
Hubbard.  Def.'s Stmt. ¶¶ K-5 to K-6; Pl.'s Resp. ¶¶ K-5 to K-6.

       The parties agree that (1) Solomon was aware that there
was an elevator at Greenberg, (2) other teachers used the
elevator for medical reasons, (3) Solomon observed other teachers
using the elevator, and (4) Solomon made no attempt to use the
elevator.  Def.'s Stmt. ¶¶ L-1, L-2 to L-5; Pl.'s Resp. ¶¶ L-1,
L-2 to L-5.  In her deposition, Solomon testified that Hubbard
never mentioned the elevator to her, Solomon Dep. at 156, though
she concedes that the elevator was offered as an accommodation
"as it pertained to moving her classroom."  Pl.'s Resp. ¶ L-5.

14

Solomon also points to deposition testimony from Hubbard[15] in
which she asserted that in January of 2008, "[w]e talked about
the elevator, that there's an elevator if she needs to move up
and down between floors." Hubbard Dep. at 118-19. In any event,
Solomon did not believe that the elevator would have provided an
effective accommodation, Def.'s Stmt. ¶ L-6; Pl.'s Resp. ¶ L-6.
As she explained in her deposition,

> [N]umber one, I had to carry things -- I have
> told you this before. Number two, I had to
> get places in a very short period of time. I
> had many jobs to do. And I -- the elevator
> was for the entire school. It was not a
> viable accommodation for me. And I had to
> pick up students, because you can't --
> couldn't have students come by themselves
> when they have not -- an executive
> functioning disorder. . . . If you knew all
> the jobs that I had to do there was a time
> element. It could not get me to where I
> wanted to. I also told you you are not
> allowed to have students in the elevator. It
> was not a viable option.

Solomon Dep. at 132-33. But Solomon later admitted that use of
the elevator required a key -- though she did not know where she
could have obtained such a key, id. at 134 -- so that students

---

[15] Solomon erroneously cites this testimony for the
proposition that "Ms. Hubbard never discussed the elevator with
the Plaintiff as a means of ongoing accommodation once the move
had been accomplished." Pl.'s Resp. ¶ L-5.

could use the elevator "[o]nly with an adult.  Not by themselves, they weren't permitted."  Id. at 135.

### D.   **Solomon's Leave From The District**

The parties agree that Solomon took sick leave from November 13 or 14, 2007 until April of 2008, receiving her full salary and benefits during this time.  Def.'s Stmt. ¶¶ M-1 to M-2; Pl.'s Resp. ¶¶ M-1 to M-2.  From April 14, 2008 until April 15, 2009, Solomon began short-term disability leave, also known as "wage continuation," during which she received seventy-five percent of her salary and all benefits.  Def.'s Stmt. ¶¶ M-3 to M-5; Pl.'s Resp. ¶¶ M-3 to M-5.  Upon the lapse of her wage continuation in April of 2009, Solomon took a health sabbatical leave that lasted until April, 2010 and she received fifty percent of her salary and all benefits during this period. Def.'s Stmt. ¶¶ M-6 to M-8; Pl.'s Resp. ¶¶ M-6 to M-8.  Solomon retired at the end of this sabbatical.  Def.'s Stmt. ¶ M-9; Pl.'s Resp. ¶ M-9.

Throughout these leaves, Solomon was obliged to submit doctors' notes to support her need for leave.  These notes stated that she was physically unable to return to work, reiterated her limitations on lifting, bending, carrying, and stair-climbing,

16

and explained that she needed a first floor classroom. Def.'s Stmt. ¶¶ M-10 to M-11; Pl.'s Resp. ¶¶ M-10 to M-11. The parties agree that before retiring Solomon did not contact Hubbard to discuss returning to her job. Def.'s Stmt. ¶ M-20; Pl.'s Resp. ¶ M-20. Solomon points to evidence that the District would not allow her to return to work unless she could do so without accommodations. Pl.'s Resp. ¶¶ L-12 (citing Ex. P-20 to Pl.'s Resp. at 36), M-19 (citing Ex. P-21 to Pl.'s Resp. at 58-59). But in November of 2010 the District offered Solomon a job[16] as a special education teacher at a school other than Greenberg. Solomon declined. Def.'s Stmt. ¶ M-23 (citing Solomon Dep. at 89, 93).

### E.  Solomon's Charges Before The EEOC

On August 28, 2008, Solomon filed a discrimination charge with the EEOC. Def.'s Stmt. ¶ N-1; Pl.'s Resp. ¶ N-1.

---

[16] Solomon protests that "[t]he District's use of a Rule 68 offer in the context of a summary judgment motion is entirely improper." Pl.'s Resp. ¶ M-23. Fed. R. Civ. P. 68(a) provides that "[a]t least 14 days before the date set for trial, a party defending against a claim may serve on an opposing party an offer to allow judgment on specified terms, with the costs then accrued." Rule 68(b) adds that "[e]vidence of an unaccepted offer is not admissible except in a proceeding to determine costs." Solomon has presented no evidence suggesting that the District's November, 2010 job offer was an offer of judgment. We will therefore reject her challenge to this offer.

Solomon's charge identified age and disability as alleged bases
of discrimination, but did not present any retaliation charge.
Def.'s Stmt. ¶¶ N-2 to N-3; Pl.'s Resp. ¶¶ N-2 to N-3.  The
charge did suggest that "the Respondent subjected her to
discrimination by . . . harassing her in connection with said
accommodation requests."  Ex. Z to Def.'s Stmt.

## II.  <u>Analysis</u>

On a motion for summary judgment, "[t]he moving party
first must show that no genuine issue of material fact exists,"
<u>Adderly v. Ferrier</u>, 419 Fed. Appx. 135, 136 (3d Cir. 2011)
(citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)),
whereupon "[t]he burden then shifts to the non-moving party to
set forth specific facts demonstrating a genuine issue for
trial."  <u>Id.</u>   "'A disputed fact is "material" if it would affect
the outcome of the suit as determined by the substantive law,'"
<u>J.S. ex rel. Snyder v. Blue Mountain Sch. Dist.</u>, 650 F.3d 915,
925 (3d Cir. 2011) (quoting <u>Gray v. York Newspapers, Inc.</u>, 957
F.2d 1070, 1078 (3d Cir. 1992)), while a factual dispute is
genuine "'if the evidence is such that a reasonable jury could
return a verdict for the nonmoving party. . . . The mere
existence of a scintilla of evidence in support of the

plaintiff's position will be insufficient; there must be [significantly probative] evidence on which the jury could reasonably find for the plaintiff." <u>Bialko v. Quaker Oats Co.</u>, 434 Fed. Appx. 139, 141 n.4 (3d Cir. 2011) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 252 (1986)) (bracketed material in original).  We "draw all reasonable inferences in favor of the nonmoving party, and [we] may not make credibility determinations or weigh the evidence." <u>Eisenberry v. Shaw Bros.</u>, 421 Fed. Appx. 239, 241 (3d Cir. 2011) (quotation marks omitted).

As the District challenges each of Solomon's claims, we will consider the arguments respecting them in turn.  Before examining these arguments, we will first clarify the nature of the claims Solomon advances.

### A.   <u>Solomon's Discrimination and Accommodation Claims</u>

As we have already noted, Solomon asserts claims under the ADA, § 504, and the PHRA based on the District's alleged failure to accommodate her disability, discrimination, and retaliation.  Under Count I, which purportedly asserts a claim for failure to accommodate under the ADA and Section 504 of the Rehabilitation Act, Solomon alleges that "[t]he District's failure to engage in the interactive process and to accommodate

Ms. Solomon in her position at Greenberg Elementary and/or to transfer her to a vacant position commensurate with her education, training, and experience, constitutes discrimination pursuant to the ADA and Section 504 solely because of Ms. Solomon's disability."  Pl.'s Compl. ¶ 98.

Under Count III, asserting discrimination under the ADA and Section 504, id. ¶ 102, Solomon alleges that

> The District intentionally discriminated against Plaintiff solely on the basis of her disability, her record of impairment, and/or because it erroneously perceived the nature and extent of her disability by, inter alia, 1) preventing Ms. Solomon from returning to work at all unless she could do so without accommodations, thereby constructively discharging her from her employment on April 16, 2010; 2) requiring Ms. Solomon, a Senior Career Teacher, to move from a full-sized classroom to a 3rd Floor teachers' lounge, knowing it would exacerbate her physical condition and/or prevent her from fulfilling her job duties; 3) refusing to provide Ms. Solomon with accommodations since November 13, 2007, knowing that those accommodations were necessary in order for her to return to work; 4) failing and/or refusing to engage in good faith in the interactive process; 5) attacking Ms. Solomon's reputation and character to explain her failure to return to work.

Though Solomon advances her ADA claims for failure to accommodate under two distinct counts, caselaw from our Court of Appeals suggests that these claims may be consolidated.  42

20

U.S.C. § 12112(a) provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."   Our Court of Appeals has explained, quoting § 12112(b)(5)(A), that "[a]n employer discriminates against a qualified individual when it does 'not mak[e] reasonable accommodations to the known physical or mental limitations of the individual unless the [employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer].'" Gaul v. Lucent Tech. Inc., 134 F.3d 576, 579 (3d Cir. 1998) (brackets in original). See also Colwell v. Rite Aid Corp., 602 F.3d 495, 504-05 (3d Cir. 2010) (noting that "[u]nder the ADA, an employer discriminates against an employee by not making reasonable accommodations" under certain circumstances) (internal quotation marks omitted); Hohider v. United Parcel Serv., Inc., 574 F.3d 169, 186 (3d Cir. 2009) (describing elements a plaintiff must prove "for a covered entity to be found liable for discrimination on the basis of failure to accommodate"); Pagonakis v. Express LLC, 315 Fed. Appx. 425, 430 n.4 (3d Cir. 2009) ("[Plaintiff's] ADA

21

discrimination claim may nonetheless proceed on her failure to accommodate theory.").

As this jurisprudence demonstrates, a claim that an employer failed to accommodate an employee's disability is best viewed not as an independent claim under the ADA, but as a theory that may support a discrimination claim, with disparate treatment representing another possible theory.  Given that Count III more comprehensively alleges Solomon's entitlement to relief, Count I appears redundant and we will thus dismiss it to the extent it asserts a claim under the ADA.

Our Court of Appeals has also noted that "[i]n light of the similarities between the integration provisions of the ADA and RA [Rehabilitation Act] and their implementing regulations, we construe and apply them in a consistent manner." Pa. Protection & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare, 402 F.3d 374, 379 n.3 (3d Cir. 2005).  Similarly, since Pennsylvania courts "generally interpret the PHRA in accord with its federal counterparts," Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996), "analysis of an ADA claim applies equally to a PHRA claim", Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999).  In addition to her claims under the ADA in Counts I and III, Solomon asserts claims for (1) failure to accommodate

22

under § 504 and the PHRA in Counts I and II, and (2)

discrimination under § 504 and the PHRA in Counts III and IV,

respectively.  Given the manner in which a discrimination claim

under the ADA subsumes any claim for failure to accommodate, and

the similarities between the ADA, the PHRA, and § 504,[17] we will

thus dismiss Count I not just with respect to the ADA but in its

entirety, and will dismiss Count II as well.

###    B.    Solomon's Discrimination Claims

As we have already noted, Solomon identifies five

distinct bases on which the District allegedly discriminated

against her in violation of the ADA, the PHRA, and § 504.  These

five grounds appear predicated upon two different theories.

Under her failure to accommodate theory, Solomon alleges that the

District (1) failed to accommodate her disability, (2) refused to

engage in a good faith interactive process to identify a

reasonable accommodation, and (3) refused to allow her to return

to work unless she could do so without accommodations.  Under her

---

[17] Indeed, Solomon herself notes that "Plaintiff also
premised her claims on Section 504 of the Rehabilitation Act and
the Pennsylvania Human Relations Act (PHRA).  Because the
standards under all three laws are essentially the same, they
will not be discussed separately in this memorandum."  Pl.'s
Resp. at 1 n.1 (citations omitted).

disparate treatment theory, Solomon alleges that due to her disability the District (1) transferred her to a third floor room knowing the move would aggravate her disability and keep her from performing her duties, and (2) attacked her reputation and character.

Our Court of Appeals has "recognized two types of disparate treatment employment discrimination actions -- 'pretext' and 'mixed-motive' -- and have applied different standards of causation depending on the type of case the plaintiff presented." Watson v. Se. Pa. Transp. Auth., 207 F.3d 207, 214 (3d Cir. 2000) (Alito, J.).  Discrimination claims based upon a failure to accommodate, in contrast, appear susceptible to only one type of analysis, in which "[t]he plaintiff must make a prima facie showing that reasonable accommodation is possible. If the plaintiff is able to meet these burdens, the defendant then bears the burden of proving, as an affirmative defense, that the accommodations requested by the plaintiff are unreasonable, or would cause an undue hardship on the employer." Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir. 1996).[18]  An employer need not

_____

[18] As our Court of Appeals explained in Gaul, 134 F.3d at 580 n.2 (quoting Mengine v. Runyon, 114 F.3d 415, 420 (3d Cir. 1997)), "[a]lthough Shiring interpreted the Rehabilitation Act of
(continued...)

have been motivated by discriminatory animus in failing to reasonably accommodate an employee.   "If a plaintiff alleges facts that, if proven, would show that an employer should have reasonably accommodated an employee's disability but failed to do so, he establishes that the employer has discriminated against him." <u>Johnson v. McGraw-Hill Companies</u>, 451 F. Supp. 2d 681, 700 n.11 (W.D. Pa. 2006) (McVerry, J.).

Solomon argues that her "failure to accommodate claim (including the claim that the District failed to engage in good faith in the interactive process) and constructive discharge claims are subject to the direct evidence analysis," Pl.'s Mem. in Resp. to Def.'s Mot. Summ. J. ("Pl.'s Mem.") at 16, which we take merely to mean that these claims are subject to the analysis set forth in <u>Shiring</u>.  Solomon also asserts that "[t]he only intentional claim the Defendant has raised which is subject to the pretext analysis is the classroom transfer issue," <u>id.</u> at 17 n.22.  Presumably, Solomon here means we should refer to her disparate treatment claims and suggests that her claim that the

_____

[18](...continued)
1973, 29 U.S.C. § 794 <u>et</u> <u>seq.</u>, it is relevant to our analysis of the ADA because 'in 1992 the Rehabilitation Act was amended to incorporate the standards of several sections of the ADA, including the section defining "reasonable accommodation."'"

District attacked her reputation and character because of her
disability should be examined under a mixed-motive analysis.

### 1.    The District's Alleged Failure To Accommodate

With respect to Solomon's claims that the District
failed to accommodate her disability, the District argues that
(1) Solomon refused "the reasonable accommodations available to
her, including a working elevator" and "the assistance of
building engineering to move her items," Def.'s Mem. in Supp. of
Mot. Summ. J. ("Def.'s Mem.") at 7; (2) it was Solomon who
"stalled the interactive process and failed to engage the School
District in a good faith dialogue as required under the ADA," id.
at 9; and (3) "Plaintiff's claim that she was 'forced' to retire
because of a failure to accommodate is self-serving and
unsupported by the record," since "[t]he record demonstrates that
Plaintiff suffered no adverse employment action."   Id. at 7.

On the first point, Solomon responds that "Hubbard
never offered the elevator as an accommodation," Pl.'s Mem. at 9,
and "[t]he District never offered to accommodate any restrictions
she would still have once the classroom move was completed."   Id.
at 7.  As for the interactive process, Solomon argues that
"Defendant never invited Ms. Solomon to participate in a meeting

of any kind to discuss her accommodation request in an effort to
ascertain how her physical limitations could be accommodated in
the workplace, either in her original assignment at Greenberg or
any other location," and "Hubbard never responded to [Solomon's
January 22, 2008] communication" in which she "set forth her
accommodation request." Id. Finally, Solomon asserts that "it
is clear that failure to provide accommodation is an adverse
action for purposes of intentional discrimination claims." Id.
at 4 n.2.

     As our Court of Appeals has explained, "[a] plaintiff
presents a prima facie case of discrimination under the ADA by
demonstrating: (1) he is a disabled person within the meaning of
the ADA; (2) he is otherwise qualified to perform the essential
functions of the job, with or without reasonable accommodations
by the employer; and (3) he has suffered an otherwise adverse
employment decision as a result of discrimination." Gaul, 134
F.3d at 580. "Adverse employment decisions in this context
include refusing to make reasonable accommodations for a
plaintiff's disabilities," where "reasonable accommodation"
include "'the employer's reasonable efforts to assist the
employee and to communicate with the employee in good faith,'
Mengine v. Runyon, 114 F.3d 415, 416 (3d Cir. 1997), under what

27

has been termed a duty to engage in the 'interactive process.'"

Williams v. Phila. Housing Auth. Police Dep't, 380 F.3d 751, 761

(3d Cir. 2004).  This duty is triggered by a plaintiff's request

for accommodation: "'"Once a qualified individual with a

disability has requested provision of a reasonable accommodation,

the employer must make a reasonable effort to determine the

appropriate accommodation."'"  Id. at 771 (quoting Jones v.

United Parcel Serv., 214 F.3d 402, 407 (3d Cir. 2000) (quoting 29

C.F.R. Pt. 1630, App. § 1630.9)).

        Our Court of Appeals has stressed, however, that "where

a plaintiff cannot demonstrate reasonable accommodation, the

employer's lack of investigation into reasonable accommodation is

unimportant."  Donahue v. Consol. Rail Corp., 224 F.3d 226, 233

(3d Cir. 2000) (Alito, J.) (internal quotation marks omitted).

The Court of Appeals for the Sixth Circuit has also noted that

"an employee cannot make his employer provide a specific

accommodation if another reasonable accommodation is instead

provided," Hankins v. The Gap, Inc., 84 F.3d 797, 800-01 (6th

Cir. 1996), inasmuch as "the employer providing the accommodation

has the ultimate discretion to choose between effective

accommodations, and may choose the less expensive accommodation

28

or the accommodation that is easier for it to provide."  29
C.F.R. Pt. 1630, App. § 1630.9(a).

Coupling this jurisprudence with that quoted above
from Shiring, the contours of claims for failure to accommodate
or engage in an interactive process become clear.  A plaintiff
alleging discrimination under the ADA based on these grounds must
show that (1) she is disabled, (2) she is qualified, and (3) her
employer (i) refused to provide her with a proposed reasonable
accommodation, or (ii) failed to engage in an interactive process
after she requested an accommodation, though a reasonable
accommodation was possible.  The employer must then show that the
proposed accommodation was not reasonable or would have caused it
undue hardship, or that the employer proposed a reasonable
accommodation that the plaintiff rejected.  In light of this
legal framework, we can reject each of the District's challenges
to Solomon's discrimination claim based upon a failure to
accommodate theory.

Taking Solomon's first claim that the District failed
to provide her with a reasonable accommodation, the District
argues that (1) it "made a good faith attempt to offer an
accommodation in the form of building engineering services to
assist with the move," Defs.' Mem. at 10; (2) "[d]uring this

29

litigation, and for the very first time, Plaintiff testified that she required an accommodation in the form of an 'assistant' to help lift and carry books for her," but "this accommodation would have been unreasonable, unfeasible and not required under the ADA," id. at 11; and (3) "Plaintiff's suggested accommodation [of assigning her to a first floor classroom] was not the only alternative as the evidence demonstrates that the school had a working elevator," id. at 13, the use of which would have been "a reasonable accommodation for Plaintiff's stated limitation of climbing stairs." Id. at 14.

Solomon responds that (1) "[t]here is no evidence whatsoever that Ms. Hubbard ever offered building engineering services to Ms. Solomon for any purpose once the move was completed," Pl.'s Mem. at 8 n. 9; (2) "Plaintiff never asked for a personal assistant," id.; and (3) "Hubbard never offered the elevator as an accommodation." Id. at 9. On this third point, the District replies that "the reasonable accommodation was the elevator, which was open, obvious and known." Def.'s Reply at 3.

As noted, a plaintiff asserting such a failure to accommodate claim must show, inter alia, that her employer refused to provide her with a proposed reasonable accommodation, whereupon the employer must show either that the proposed

30

accommodation was not reasonable or that it proposed a reasonable accommodation that the employee rejected.  Solomon is not now claiming that she proposed the accommodation of an assistant to the District, so the reasonableness of this accommodation is not before us.  Instead, the District itself concedes that she requested the accommodation of a first-floor classroom to accommodate her bending, lifting, carrying, and stair-climbing restrictions.  Def.'s Stmt. I-1.  The District does not challenge the reasonableness of this proposed accommodation, or indeed any of the elements of Solomon's <u>prima</u> <u>facie</u> case[19], but it argues that it proposed two reasonable accommodations -- the use of building services to help Solomon move materials, and the use of Greenberg's elevator -- that Solomon refused.

It is plain that there is an issue of fact at this point precluding us from concluding that either of these proposals in fact would have reasonably accommodated Solomon.  A jury could readily conclude that building services could not have helped Solomon ferry her materials each period from the second

---

[19] Solomon notes that "[t]he District has not challenged the Plaintiff's disability in its motion.  Likewise, she [<u>sic</u>] has admitted that Ms. Solomon is otherwise qualified." Pl.'s Mem. at 15 n.21.  The District does not dispute these assertions, and we have identified no arguments respecting these elements of Solomon's claim in the District's memoranda.

floor to the third-floor classroom to which the District had

assigned her, and that Solomon's difficulty carrying items would

have precluded her from moving these materials between floors

herself -- even with the use of the elevator.  Moreover, the

District has presented no evidence demonstrating that it proposed

the daily use of building services as an ongoing accommodation of

Solomon's alleged disability,[20] and Solomon has presented a

genuine issue of fact as to whether the District ever proposed

the use of Greenberg's elevator in her daily teaching

responsibilities (as opposed to moving her between classrooms).

Pl.'s Resp. ¶ L-5.

     The District cites <u>Loulseged v. Akzo Nobel Inc.</u>, 178

F.3d 731, 736 (5th Cir. 1999), for the proposition that "there

may be some situations in which the reasonable accommodation is

---

[20] The District points to evidence suggesting that
Hubbard's October 9, 2007 memorandum to Solomon stated that "If
you need any small furniture items moved, school engineering
staff will provide assistance," Def.'s Stmt. ¶ J-3, and that her
November 7, 2007 memorandum reiterated that "Mr. Mizia and his
building engineering team are available to assist you with your
transition.  Please contact him immediately to plan a schedule
for moving your items." <u>Id.</u> ¶ J-4.  The District also alleges
that "building engineering services remained available to
Plaintiff during the entire time from October 2007 to her
retirement in April of 2010." <u>Id.</u> ¶ M-14.  This evidence, if
credited, still does not suggest that the District <u>proposed</u> use
of building services as an <u>ongoing</u> accommodation to Solomon.

so obvious that a solution may be developed without either party consciously participating in an interactive process". Here we cannot conclude that a key-operated elevator - to which Solomon did not have the key that may have addressed her stair-climbing restriction but not her bending, lifting, or carrying limitations -- constituted a reasonable accommodation.[21] This dooms dismissal of Solomon's failure to accommodate claim. Issues of fact thus preclude us from concluding, as a matter of law, that the District proposed reasonable accommodations that Solomon refused.

We turn next to Solomon's claim that the District failed to engage in the interactive process. The District argues[22] that in January of 2008 Hubbard asked Solomon "what the School District could do to assist with Plaintiff's physical limitations," but Solomon "made no good faith response". To the contrary, Solomon merely "forwarded another doctor's note listing

_____

[21] Much less without the District so much as proposing it to her.

[22] To the extent the District also argues that it participated in the interactive process by proposing the accommodation of assistance from building services and use of Greenberg's elevator, our analysis above -- as to whether the District ever proposed these accommodations to assist Solomon on a daily basis with her restrictions -- applies.

33

the same, general limitations." Def.'s Mem. at 10.  The District

thus appears to focus on the elements of Solomon's prima facie

case requiring that she prove she requested an accommodation, and

conceding for the purposes of this motion the other elements --

that Solomon was disabled and qualified, and that a reasonable

accommodation existed.  But the District's argument carries no

weight.  Solomon has presented evidence demonstrating that after

Hubbard's call[23] she not only requested an accommodation but

requested the specific accommodation of a first-floor classroom,

Pl.'s Resp. ¶ K-2, and that Hubbard never responded to this

request.[24]  Solomon Dep. at 20.  As a result, there is a genuine

issue of material fact as to whether Solomon can prove this

element of her prima facie case.

_____

[23] Moreover, our Court of Appeals has observed that "a
single phone call between an employer and an employee 'hardly
satisfies our standard that the employer make reasonable efforts
to assist the employee [and] to communicate with him in good
faith.'"  Williams, 380 F.3d at 772 n.16 (quoting Deane v. Pocono
Medical Center, 142 F.3d 138, 139 (3d Cir. 1998)).

[24] The District has presented no evidence suggesting
that any further contact between the District and Solomon
concerning her accommodations occurred until the District's
November, 2010 offer to return Solomon to her position as a
special education teacher at a different school.  Def.'s Stmt. M-
23.  We will thus infer that no such contacts took place.  A
single offer after three years of silence to re-hire a plaintiff,
made after litigation has already begun, hardly constitutes good-
faith participation in the interactive process under the ADA.

Finally, the District suggests that its alleged refusal to allow Solomon to return to work unless she could do so without an accommodation did not constitute an adverse employment action.[25]  Importantly, the District does not dispute, for the purposes of this motion, that it so refused.  As our Court of Appeals explained in Williams, 380 F.3d at 761, "[a]dverse employment decisions in this context include refusing to make reasonable accommodations for a plaintiff's disabilities."  If failing to make a reasonable accommodation is an adverse employment decision, it would appear that barring an employee from returning to work unless she could do so without accommodations -- which, functionally, appears to us to be the logical equivalent of the former -- would similarly qualify as such an action.  The District's challenge is thus meritless.

_____

[25] The parties spill much ink arguing about whether a failure to accommodate may constitute a constructive discharge. See Def.'s Mem. at 15-17; Pl.'s Mem. at 12-14; Def.'s Reply at 6-7.  Given that the parties agree that a failure to accommodate itself constitutes an adverse employment action, see Pl.'s Mem. at 4 n.2; Def's Reply at 2, it is unclear why they devote so much time bickering about whether it also constitutes another kind of adverse employment action, i.e., constructive discharge.

## 2.   __The District's Alleged Disparate Treatment__

With respect to Solomon's disparate treatment claims, the District contends that "[t]he District's actions in moving Plaintiff's classroom . . . were for entirely non-discriminatory reasons."  Def.'s Mem.  at 18.  As already noted, Solomon appears to press her disparate treatment claim based upon the District's transfer of her classroom upon a pretext theory.[26]

In pretext cases, "[a] plaintiff presents a prima facie case of discrimination under the ADA by demonstrating: (1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination."  Gaul, 134 F.3d at 580.  Once a plaintiff has established a prima facie case,

---

[26] With respect to the second ground for her disparate treatment claim, Solomon notes that "the Defendant has not addressed Ms. Solomon's claim that Ms. Hubbard attacked Ms. Solomon's reputation and character to explain her failure to return to work," Pl.'s Mem. at 15 n.21 -- a contention that the District does not dispute in its reply and that, upon examination of its briefs, appears accurate with respect to Solomon's discrimination claim.  However, as we note in Section II.C, below, the District does attack Solomon's evidence in support of this alleged adverse action as to her retaliation claim.

> the burden shifts to the defendant to state a
> legitimate, nondiscriminatory reason for its
> action.  If the defendant meets that burden,
> the presumption of discriminatory action
> raised by the prima facie case is rebutted.
> The plaintiff may respond by showing that the
> defendant's proffered reason was pretextual.
> To prove that an explanation is pretextual, a
> plaintiff must cast sufficient doubt upon
> each of the legitimate reasons proffered by
> the defendant so that a factfinder could
> reasonably conclude that each reason was a
> fabrication or allow the factfinder to infer
> that discrimination was more likely than not
> a motivating or determinative cause of the
> adverse employment action.

Majewski v. Fischi, 372 Fed. Appx. 300, 304 (3d Cir. 2010)

(internal quotation marks, brackets, and ellipses omitted).

The District thus appears to concede, for the purposes

of its motion, that Solomon has made out her prima facie case[27]

---

[27] The District does argue that "[o]nly after Hubbard
made the decision to place the new autistic classroom in
Plaintiff's classroom did Plaintiff notify the District of any
physical limitations or request for accommodation," Def.'s Mem.
at 19, so that it may appear to challenge the third element of
Solomon's prima facie case: that any adverse employment action
resulted from discrimination.  Solomon has pointed to evidence,
however, that she "told her Principal, Gina Hubbard, that she was
having problems with her back on October 9, 2007," Pl.'s Resp. at
3 (citing Solomon Dep. at 79), the same day that Hubbard notified
her that she was transferring her classroom.  We will infer -- in
Solomon's favor -- that Hubbard's decision to transfer the
classroom temporally followed Solomon's notification that she was
having back problems.  As we note above, the District has not
challenged whether these back problems constituted a disability.
The District also argues that "a change in classroom assignment
(continued...)

and challenges her to point to evidence that its proffered
legitimate reasons for its decision to transfer her were
pretextual.  In its memorandum, the District suggests that the
need to identify a space for a new autistic support program
required that it move Solomon to Room 311, explaining that: (1)
"Hubbard was required to identify a proper space for the new
autistic support classroom," and such classrooms "are typically
placed on the first or second floor," Def.'s Mem. at 18; (2)
"classroom 213, which was very large, would be most suitable and
would cause the least disruption to the school," id.; and (3)
"[t]his required Plaintiff to move to a new classroom of
comparable size with other resource room teachers."  Id.  Solomon
has presented evidence that undermines this legitimate reason,
suggesting that the small size of the autistic program made it
better suited to Room 311, Pl.'s Resp. ¶ B-7, and that moving
Solomon's classroom caused significant disruption to the school
because Solomon could not move all her materials to that room and
that this move upset at least one parent. Id.  A reasonable jury

---

[27](...continued)
is not an adverse employment action within the meaning of the
law," Def.'s Reply at 2, but since it raises this specific
argument for the first time in its reply, we will not consider
it.

could, if it credited this evidence, conclude that the District's reason was pretextual (although it by no means would _have_ to draw such a conclusion[28]).  Given that a genuine dispute of fact thus persists as to the last step identified in Majewski, we cannot grant summary judgment on Solomon's disparate treatment claim.

**C.    Solomon's Retaliation Claim**

42 U.S.C. § 12203(a) provides, regarding retaliation, that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  In Solomon's complaint, she alleges that the District

> treated her adversely as a result of her
> requests for accommodation and her EEOC
> charge, by _inter alia_, 1) preventing Ms.
> Solomon from returning to work at all unless
> she could do so without accommodations,
> thereby constructively discharging her from

---

[28] Even Solomon appears to recognize the underwhelming force of her claim that Hubbard learned of her alleged disability and then decided to transfer her _because_ of it, noting that "Ms. Hubbard might not have singled out Ms. Solomon for a room change on the basis of her disability or any other protected characteristic from the outset."  Pl.'s Mem. at 21.  Nonetheless, drawing all inferences in Solomon's favor as we must at this time, her claim survives.

her employment on April 16, 2010; 2)
requiring Ms. Solomon, a Senior Career
Teacher, to move from a full-sized classroom
to a 3rd Floor teachers' lounge, knowing it
would exacerbate her physical condition
and/or prevent her from fulfilling her job
duties; 3) refusing to provide Ms. Solomon
with accommodations since November 13, 2007,
knowing that those accommodations were
necessary in order for her to return to work;
4) failing and/or refusing to engage in good
faith in the interactive process; 5)
attacking Ms. Solomon's reputation and
character to explain her failure to return to
work and to penalize her for opposing the
District's illegal conduct and for
participating in proceedings before the EEOC
to redress the District's discriminatory
conduct.

Pl.'s Compl. ¶ 108.

Among other arguments, the District asserts that

Solomon (1) "has not exhausted her administrative remedies with

respect to her retaliation claims under the ADA and PHRA."

Def.'s Mem. at 20, (2) "cannot demonstrate that she suffered an

adverse employment action," id., and (3) "cannot demonstrate a

causal connection between any protected activity and the

District's actions."  Id. at 21.

We begin by noting that our Court of Appeals has

explained that a "failure to accommodate theory . . . cannot be

characterized as a retaliation claim under the ADA.  The claim is

a direct discrimination claim based on alleged failures to

40

fulfill the affirmative duties prescribed by the ADA, not a claim
based on alleged actions prohibited by the ADA." <u>Pagonakis</u>, 315
Fed. Appx. at 431 (citations omitted).  Solomon appears merely to
have reiterated the grounds for her discrimination claim as bases
for her retaliation claim, but the first, third, and fourth
grounds may only support the former claim, not the latter.

        With respect to Solomon's fifth ground -- that the
District attacked her reputation and character -- we start with
the District's first argument, that Solomon failed to include any
retaliation claim in her EEOC charge.  Solomon argues that a
district court may assume jurisdiction over additional charges
"'if they are reasonably within the scope of the complainant's
original charges and if reasonable investigation by the EEOC
would have encompassed the new claims.'" Pl.'s Mem. at 17
(quoting <u>Howze v. Johnson & Laughlin Steel Corp.</u>, 750 F.2d 1208,
1212 (3d Cir. 1984)).  As already noted, Solomon included in her
EEOC charge the allegation that "the Respondent subjected her to
discrimination by . . . harassing her in connection with said
accommodation requests."  Ex. Z to Def.'s Stmt.  On the basis of
this allegation, we conclude that Solomon's retaliation claim was
within the scope of the EEOC charge to the extent that it rests
on the District's alleged attacks on her reputation.

41

We turn to the District's second argument, that Solomon has not demonstrated any adverse employment action.  Our Court of Appeals explained in Krouse v. American Sterilizer Co., 126 F.3d 494, 500-01 (3d Cir. 1997) (citations omitted), that

> To establish a prima facie case of retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. If an employee establishes a prima facie case of retaliation under the ADA, the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action. . . . If the employer satisfies its burden, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.

Thus, an element of Solomon's prima facie case of retaliation is that the District subjected her to an adverse action after her protected conduct.  Solomon fails to point to any evidence in the record that suggests that Hubbard or anyone else at the District attacked her reputation or character.[29]  Because Solomon has failed to demonstrate that there is a dispute of material fact as

---

[29] We assume, for the purposes of this argument, that the alleged attacks would have qualified as an adverse action.

to whether the District took the adverse action alleged in the fifth ground of her retaliation claim, we will dismiss the claim to the extent it rests on that ground.

Finally, we turn to Solomon's fourth basis for her claim, that the District transferred her knowing that the move would exacerbate her disability.  The District argues that "[t]he decision to move Plaintiff's class from room 213 to room 311 occurred before she complained of any physical limitations." Def.'s Mem. at 22.  As we have already explained, while Solomon has presented evidence suggesting that these events actually happened on the same day, it is nonetheless true that Solomon has presented <u>no</u> evidence suggesting that she engaged in the specified <u>protected</u> <u>activity</u> -- <u>i.e.</u>, requesting accommodations or filing a charge with the EEOC -- <u>before</u> this decision was made.  Indeed, Solomon admits that (1) Hubbard informed her of the decision to move her class on October 9, 2007, Pl.'s Resp. ¶ C-1; (2) she first requested an accommodation from the District on October 19, 2007, <u>id.</u> ¶ E-3, and (3) she filed her EEOC charge on August 28, 20<u>08</u>.  <u>Id.</u> ¶ N-1.  The adverse action of which Solomon complains in her fourth ground, then, did not occur "either after or contemporaneous with the employee's protected activity," as <u>Krouse</u> requires.  126 F.3d at 500.  We will

43

accordingly dismiss the fourth ground of Solomon's retaliation claim, and grant the District's motion for summary judgment as to this claim in its entirety under the ADA, the PHRA, and § 504.[30]


BY THE COURT:


\_\_\s\Stewart Dalzell

---

[30] It will be recalled that our analysis respecting Solomon's retaliation claim under the ADA applies equally to her retaliation claims under § 504 and the PHRA.